AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Oregon

FILED06 FEB '19 15:41USDC-ORP

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   '19 –MC– 84
Grey Honda Odyssey van bearing North Dakota license )
plates JXY159 and VIN: 5FNRL38625B055910 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
As set forth in Attachment A

located in the _____ District of _____ Oregon _____ , there is now concealed *(identify the person or describe the property to be seized):*
As set forth in Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 84 | Drug Trafficking |
| 18 U.S.C. § 922(g) | Felon in Possession of a Firearm |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Scott McGeachy, IRS CI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/6/2019

_____
*Judge's signature*

City and state:  Portland, Oregon

Honorable Jolie Russo, United States Magistrate Judge
*Printed name and title*

DISTRICT OF OREGON, ss:          AFFIDAVIT OF SCOTT McGEACHY

**AFFIDAVIT OF SCOTT McGEACHY**
**in Support of an Application**
**Under Rule 41 for a Search Warrant**

I, Scott A. McGeachy, being duly sworn, do hereby depose and state as follows:

## I.     AFFIANT BACKGROUND AND EXPERIENCE

1.      I am a Special Agent employed by the Internal Revenue Service (IRS), Criminal Investigation, and have held this position for seventeen years.  I have successfully completed the 11-week Criminal Investigator Training Course at the Federal Law Enforcement Training Center and the 16-week Special Agent Basic Training course put on by the Internal Revenue Service. During this time I have either conducted or been involved in investigations concerning Title 26 (Income Tax), Title 18 (Conspiracy and Money Laundering), Title 21 (Controlled Substances), and Title 31 (Bank Secrecy Act) violations by individuals involved in both legal and illegal occupations.

2.      I have written and/or directly been involved in writing over one hundred eighty-five search and/or seizure warrants and have participated in the execution of numerous federal search warrants involving criminal income tax charges, money laundering, narcotics violations, and other criminal activities during which evidence of criminal violations was seized.  For the past twelve years I have predominantly worked investigations involving narcotics trafficking and money laundering.

## II.     PURPOSE OF AFFIDAVIT

3.      This Affidavit is submitted in support of an application to search the following vehicle described as a grey Honda Odyssey van bearing North Dakota license plates JXY159 and VIN: 5FNRL38625B055910 (hereinafter, "**Honda Odyssey**") currently located on the property

Page 1 – Affidavit of Special
Agent Scott McGeachy

of Kathy Bazeghi located at 25445 S. Hwy 213, Mulino, OR 97042, as further described in

Attachment A, for evidence, fruits and instrumentalities of drug trafficking by Dustin LARK

(hereinafter "LARK"), in violation of 21 U.S.C. §§ 841(a)(1) and 846, felon in possession of a

firearm in violation of 18 U.S.C. § 922(g)(1), and instrumentalities of money laundering in

violation of 18 U.S.C. § 1956, as those items are set forth in Attachment B.

4.      This affidavit is intended to show only that there is sufficient probable cause for the

requested warrant and does not set forth all of my knowledge about this matter.  The facts set forth

in this affidavit are based on my own personal knowledge, knowledge obtained from other

individuals during my participation in this investigation, including other law enforcement officers, a

review of records related to this investigation, search warrant information, communications with

others who have knowledge of the events and circumstances described herein, and information

gained through my training and experience.

### III.   STATEMENT OF PROBABLE CAUSE

5.      The Portland Police Bureau (Portland, OR) (PPB), Federal Bureau of

Investigation (FBI) and Internal Revenue Service Criminal Investigation (IRS CI) are

investigating Dustin LARK for distribution of controlled substances, felon in possession of a

firearm and money laundering arising from a May 31, 2017, search warrant executed at LARK's

residence at 12820 NE Rose Parkway, Portland, OR 97230.  Exact date unknown, but as early as

January 2014, LARK moved to North Dakota and worked in the fracking business until early

2015 when he moved back to Portland, OR.  The investigation found that LARK continued to

travel back and forth between Portland, OR, and Minot, ND, following his move to Portland in

early 2015.

6.      LARK has prior convictions for 2nd degree robbery, delivery of a controlled substance within 1,000 Feet of a School and delivery of methamphetamine within 1,000 feet of a school. LARK's conviction of 2nd degree robbery resulted in a 70-month term of imprisonment and LARK's conviction of delivery of methamphetamine with 1000 feet of a school resulted in a 48-month term of imprisonment. LARK has a pending case in Ward County, North Dakota, as LARK was charged on September 6, 2016, with the charge of "Amphetamine-Manufacture-Aggravating."

7.      On May 31, 2017, members of the Federal Bureau of Investigation, Portland Police Bureau, Drug Enforcement Administration (DEA), and IRS Criminal Investigation executed a search warrant at LARK's residence at 12820 NE Rose Parkway, Portland, OR. Inside a safe in the downstairs bedroom occupied by LARK's mother, Julie Davy, investigators found a kilo of cocaine along with a second smaller baggie containing cocaine. Law enforcement officers seized three firearms inside the safe including a Taurus "The Judge" revolver s/n DW301080, a black Jennings .22 caliber firearm s/n 533363 and a Taurus .38 revolver s/n GY64304. Officers also found during the search an empty Glock 23 box bearing s/n WPW759, which that firearm was not one of the firearms seized from the safe. The plastic bag containing the kilogram of cocaine was tested for latent prints. Oregon State Police Latent Print Examiner Karl Deering positively determined that multiple prints from the plastic bag containing the kilogram of cocaine were those of Dustin LARK.

8.      LARK was not present on May 31, 2017 during the search of his residence and Julie Davy opened the safe for law enforcement officers. Davy stated that she (Davy), LARK and LARK's wife Savannah Ward were the only individuals with access to the safe. Davy stated the cocaine and firearms did not belong to her. On February 1, 2019, FBI agents interviewed

Savannah Ward who told officers the firearms found inside the safe on May 31, 2017 did not belong to her and the safe belonged to Dustin Lark who moved it back to Oregon from North Dakota. Ward stated anything in the safe belong to LARK.

9.      An Alcohol Tobacco and Firearms (ATF) trace on the three firearms found inside the safe on May 31, 2017 resulted in two of the three firearms being confirmed stolen out of North Dakota which included the Judge .45 caliber Taurus s/n DW301080 and the Taurus Revolver s/n GY64304.

10.     On May 31, 2017, the Honorable Youlee Yim You, U.S. Magistrate Judge in the District of Oregon authorized a seizure warrant (*17-MC-248-D*) for LARK's 2011 Toyota Tundra OR/373HDB, which is the same day as the execution of the search warrants on LARK's residence. On July 14, 2017, the fourteen (14) days to execute the seizure warrant 17-MC-248-D on LARK's Toyota Tundra OR/373HDB expired. On July 15, 2017, Ward County Task Force Officer Charles "Shane" Johnson located LARK's Toyota Tundra in Minot, North Dakota, driven by Marcus Eugene West. TFO Johnson followed Marcus West in the Tundra to an apartment complex in Burlington, ND.

11.     On July 15, 2017, The Honorable Stacie F. Beckerman, U.S. Magistrate Judge in the District of Oregon authorized a seizure warrant (*17-MC-278*) for LARK's Toyota Tundra. TFO Johnson maintained surveillance on Toyota Tundra and observed West park the Tundra in the parking lot of the apartment complex. A short time later LARK was seen getting into a Volkswagen at the same apartment complex. Officers approached LARK to inform him of the seizure of the Toyota Tundra; however, LARK quickly departed from the apartment complex in the Volkswagen.

12.     On July 15, 2017, Ward County Drug Task Force officers seized LARK's Toyota Tundra. A subsequent inventory of the Tundra found a loaded 9 mm Taurus handgun, eighteen (18)

rounds of ammunition stuffed between the center console and driver's seat. Officers also found a pink plastic container with cocaine residue, insurance paperwork for the Tundra held in LARK's mothers' name, vehicle receipts for car maintenance held in LARK's name, Hertz rental car receipts in LARK's name, invoices for LARK's purchase of a 2010 Volkswagen held in the North Dakota temporary trip permit of INYM, LLC (Oregon corporation formed by LARK on August 18, 2014) for $6,050 in cash and LARK's Oregon driver's license.

13.     On November 14, 2017, the Grand Jury for the District of Oregon returned a superseding indictment "*3:17-CR-387*" against Dustin LARK on a charge of Possession with Intent to Distribute Cocaine in excess of 500 grams or more. A subsequent arrest warrant was issued for LARK on November 14, 2017. On April 10, 2018, the Grand Jury for the District of Oregon returned a second superseding indictment to include two counts of money laundering related to the deposit of $45,000 into a Chase Bank account held in the name of Dustin Lark dba Choice D's Janitors and as well as for the purchase of a Toyota Tundra both involving proceeds originating from the Distribution of a Controlled Substance for conduct starting October 21, 2014, and continuing to an unknown date.

14.     The financial investigation identified that LARK would utilize cash to purchase vehicles and title the vehicles jointly with family members and/or leave the vehicles in a temporary trip permit. The North Dakota temporary trip permits listed the owner's name of these vehicles as LARK's family members or were in corporate names designed to conceal and disguise LARK's ownership interest in the vehicles. Starting on October 21, 2014 and continuing through April 15, 2017, LARK purchased ten vehicles utilizing cash in excess of $100,000. Four of the ten vehicles were held in temporary North Dakota trip permits in the name of Julie Davy, Savannah Ward, INYM and Choice D's Janitors and a summary of their purchases are as follows:

- 2008 Dodge Charger purchased for $4,000 by LARK on April 15, 2017, temporary trip permit in the name of Julie Davy
- 2002 Cadillac Escalade purchased for $4,800 by LARK on April 2, 2016, temporary trip permit in the name of Savannah Ward
- 2010 Volkswagen CC Sport purchased for $6,000 by LARK on May 20, 2017, temporary trip permit in the name of INYM, LLC
- 2008 Volkswagen Touraeg purchased for $8,100 by LARK on March 14, 2017, temporary trip permit in the name of Choice D's Janitors.

15.     On February 4, 2019, I interviewed Kathy Bazeghi of Oregons Best Mortgage who worked as the loan processor for Dustin LARK's purchase of 12820 NE Rose Parkway, Portland, OR, which LARK successfully closed on in August 2016.

16.     Bazeghi knew LARK as he was high school friends with her son Joe Bazeghi. Bazeghi stated during high school LARK was kicked out of his parent's house. Bazeghi let LARK live at her residence for a couple months until he graduated from Lakeridge High School. Bazeghi has maintained contact with LARK over the years and that was why LARK contacted Bazeghi to assist with his loan.

17.     Bazeghi stated that in the Spring of 2017 her son contacted LARK and asked if he could borrow LARK's **Honda Odyssey**. LARK agreed and drove the **Honda Odyssey** to Bazeghi's residence in Damascus, Oregon to let the family borrow the **Honda Odyssey**. Bazeghi stated it appeared that LARK and Savannah Ward had cleaned up the **Honda Odyssey** prior to them dropping it off with Joe Bazeghi. Bazeghi stated at that point in time Bazeghi was living at 9621 SE Tower Drive, Damascus, OR, but they had purchased their property at 25445 S. Hwy 213, Mulino, OR 97042 and were transitioning from their Damascus residence to their Mulino residence, which took several months. Bazeghi stated the **Honda Odyssey** was initially maintained at the Damascus property until they moved to their Mulino residence.

18.     Bazeghi attended a Fourth of July party at LARK's residence on July 4, 2017. Bazeghi noted numerous cars from North Dakota belonging to LARK that were parked at

LARK's residence.   Bazeghi presumed that LARK was in no hurry to have the **Honda Odyssey**

returned back to him because there was no room left to park another vehicle at the Rose Parkway

residence.

19.     Bazeghi stated in late 2017 she received a phone call from LARK.  LARK

informed Bazeghi that he was on the run from law enforcement and he needed the **Honda**

**Odyssey** returned to him.  LARK told Bazeghi his "fancy car" had been seized by law

enforcement and he needed to take possession of the **Honda Odyssey** so he could travel to see

Savannah Ward's family in Virginia.  LARK told Bazeghi that law enforcement had recently

stopped LARK and searched LARK's vehicle and found suboxene in the car while in North

Dakota.  LARK told Bazeghi that somebody must have slipped the suboxene into the vehicle and

that the drugs did not belong to LARK.  Bazeghi stated the "fancy car" LARK referred to was

his red Toyota Tundra.  LARK told Bazeghi it was LARK's belief the government was going

after LARK for his house and everything that he owned.

20.     Bazeghi told LARK that the **Honda Odyssey** was no longer operational.  Bazeghi

had to utilize a super battery to move the vehicle from Damascus residence to her Mulino

residence.  Bazeghi was told the **Honda Odyssey** needed a new alternator and Bazeghi did not

want to pay for a new alternator for LARK's **Honda Odyssey**.  LARK did nothing further to

come and pick up his **Honda Odyssey**.

21.     Bazeghi stated during the period of time she borrowed LARK's **Honda Odyssey**

she became concerned about being stopped by law enforcement and wanted to confirm there was

a registration in the vehicle.  Bazeghi attempted to open the glove compartment of the **Honda**

**Odyssey** and found that it was locked and she was unable to gain access to the glove

compartment.  Bazeghi stated that the key provided by LARK to operate the **Honda Odyssey** did

not contain a second key to open the glove compartment.

22.    Bazeghi stated the **Honda Odyssey** is currently parked on her property at 25445

S. Hwy 213, Mulino, OR 97042.  Bazeghi stated that she would provide consent for law

enforcement to search the vehicle and that Bazeghi would like law enforcement to actually tow

the vehicle from her property because she does not know how to dispose of the **Honda Odyssey**,

which is no longer operational and sitting in disrepair on her property in Mulino, OR.

23.    Detective Scott McCollister of Portland Police Bureau ran ND/JXY159 through

North Dakota Department of Motor Vehicles, which came back registered as a 2005 **Honda**

**Odyssey** registered to Brian and Rebecca Clouse.  I know LARK has purchased numerous

vehicles and often leaves the registration with a trip permit or fails to register the vehicle in his

name following the purchase.  Furthermore, based on my training and experience, I know it is

common for individuals involved in drug trafficking to fail to register a vehicle in their name

following the purchase of a vehicle in order to conceal their ownership interest from law

enforcement.

24.    Finally, I know that multiple firearms and a kilo of cocaine was found inside a

safe in LARK's residence and a handgun was also found inside LARK's Toyota Tundra in

Minot, North Dakota when it was seized by the Minot Police Department.  I know that Bazeghi

has informed me the glove compartment of the **Honda Odyssey** was locked when they initially

borrowed the van from LARK and is currently still locked.  Bazeghi and her son, Joe Bazeghi,

have been in custody of the **Honda Odyssey** since they borrowed the van from LARK and have

never accessed the glove compartment in the **Honda Odyssey**.  I know from my training and

experience that individuals involved in drug trafficking often trade narcotics for firearms

especially if they are convicted felons and can no longer legally purchase firearms. I know that a glove compartment is common storage location by individuals to store drugs or guns. I know that an empty Glock 23 box bearing s/n WPW759 was found inside LARK's residence on May 31, 2017, but a Glock firearm was not located during the search of the residence. Furthermore, I know the **Honda Odyssey** currently shows the vehicle registered to Brian and Rebecca Clouse and glove compartments often maintain information regarding a Bill of Sale, registration and other documents that show ownership of the vehicle.

### IV. Background and Knowledge of Drug Traffickers

25. Based upon my training, experience, and participation in this and other investigations involving narcotics trafficking, my conversations with other experienced investigators and law enforcement agents with whom I work, and interviews of individuals who have been involved in the trafficking of narcotics, I have learned and know the following:

26. Drug trafficking organizations often utilize "stash houses" to conceal their illegal activities and contraband. These houses often remain unoccupied, with minimal activity, in order to avoid scrutiny. Drug traffickers often utilize multiple "stash houses" to conceal large amounts of narcotics and to keep law enforcement and/or competitors from finding their narcotics.

27. It is common to find papers, letters, billings, documents, and other writings, which show ownership, dominion, and control of businesses, residences, and/or vehicles in the residences and vehicles of drug traffickers. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises also include canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, keys, financial papers, rental

receipts and property ownership papers, personal and business telephone and address books and telephone toll records; and other personal papers or identification cards in the names of subjects involved in the criminal activity being investigated.

28.    It is common for drug dealers to secrete proceeds of illegal narcotics sales and records of illegal narcotics transactions in secure locations within their residences, and/or vehicles for their ready access and to conceal them from law enforcement authorities.

29.    Drug traffickers amass large proceeds from the illegal sale of controlled substances that they attempt to legitimize.  To accomplish these goals, drug traffickers utilize financial institutions and their attendant services, securities, cashier's checks, safe deposit boxes, money drafts, real estate, shell operations, and business fronts.  Persons involved in drug trafficking and/or money laundering keep papers relating to these activities for future reference, including Federal and State tax records, loan records, mortgages, deeds, titles, certificates of ownership, records regarding investments and securities, safe deposit box rental records and keys, and photographs.  I know from my training and experience that often items of value are concealed by persons involved in large scale drug trafficking inside of safes, lock boxes, and other secure locations within their residences, outbuildings, and vehicles.

30.    Drug traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies, and that even though these assets are in other individual or business names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them.

31.    Unexplained wealth is probative evidence of crimes motivated by greed, in particular, illegal trafficking in narcotics.

32.     Drug traffickers often document aspects of their criminal conduct through photographs or videos of themselves, their associates, their property, and their product.  Drug traffickers usually maintain these photographs or videos in their possession.

33.     Drug traffickers must maintain large amounts of United States currency in order to maintain and finance their ongoing illegal drug trafficking business.  It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

34.     Drug traffickers utilize mobile electronic devices including cellular telephones and other wireless communication devices for the purpose of maintaining their illegal trafficking business. Such equipment often contains evidence of these illegal activities.


35.     It is common for drug dealers to possess narcotics, drug paraphernalia and other items which are associated with the importation, manufacture, sale and use of controlled substances such as scales, containers, cutting agents and packaging materials in their residences and vehicles.

36.     Drug traffickers commonly have in their possession, that is, on their person, and/or at their businesses, residences, storage lockers, and/or vehicles, firearms, and other weapons, which are used to protect and secure their property.

37.     Manufacturers, importers and distributors of narcotics frequently try to conceal their identities by using fraudulent names and identification cards.  Once identities have been

created or stolen from other citizens, drug traffickers use those identifications to falsify records such as Department of Motor Vehicle and phone records for the purpose of theft of services and to evade detection by law enforcement.

38.    It is a common practice for drug traffickers to maintain records relating to their drug trafficking activities in their residences, storage lockers, and businesses.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" these items from their suppliers, such record keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  These records include "pay and owe" records to show balances due for drugs sold in the past (pay) and for payments expected (owe) as to the trafficker's suppliers and distributors, telephone and address listings of clients and suppliers, and records of drug proceeds.  These records are commonly kept for an extended period of time.

39.    Narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the importation, transportation, and distribution of controlled substances.  These documents whether in physical or electronic form, are maintained where the traffickers have ready access to them.  These documents include travel records, receipts, airline tickets, auto rental agreements, invoices, and other memorandum disclosing acquisition of assets and personal or business expenses.  I also know that the most promising place to find such items is within narcotics traffickers residences.

40.    Evidence of illegal trafficking of controlled substances and money laundering, such as the items described above, is likely to be found where the dealers live even if the distribution or transaction did not occur at the residence.  Moreover, individuals involved in

large, long-term drug trafficking organizations typically maintain such evidence for an extended period of time.

41.     Latent fingerprints and palm prints are frequently found in drug traffickers residences and vehicles, and can be evidence of dominion, control, and possession of those residences and vehicles.

## V.     CONCLUSION

42.     Based on the foregoing, I have probable cause to believe, and I do believe, that Dustin LARK has committed crimes of drug trafficking, felon in possession of a firearm and money laundering, and that evidence of those offenses, as described above and in Attachment B, are presently located inside the **Honda Odyssey**, which are described above and in Attachment A.  I therefore request that the Court issue a warrant authorizing a search of the **Honda Odyssey** as described in Attachments A, for the items listed in Attachments B and the seizure and examination of any such items found.

43.     Prior to being submitted to the Court, this affidavit, the accompanying application, and the requested search warrant were all reviewed by Assistant United States Attorney (AUSA) Benjamin Tolkoff, and AUSA Tolkoff has advised me that in his opinion the affidavit and application are legally and factually sufficient to establish probable cause to support the issuance of the requested warrant.

### Request for Sealing

44.     It is respectfully requested that the Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested search warrant, including the application, this affidavit, the attachments, and the requested search warrant.  I believe that sealing these documents is necessary because the information to be seized is relevant to an

ongoing investigation, and any disclosure of the information at this time may endanger the safety

of cooperating individuals, cause the flight from prosecution of co-conspirators, and otherwise

jeopardize the ongoing investigation.  Premature disclosure of the contents of the application,

this affidavit, the attachments, and the requested search warrant may adversely affect the

integrity of the investigation.

 

Scott McGeachy
Special Agent, IRS Criminal Investigation


Subscribed and sworn to before me this 6th day of February 2019.

HONORABLE JOLIE A. RUSSO
United States Magistrate Judge

### Attachment A – Vehicle to be Searched

Based on the information contained in this affidavit, I am requesting a warrant to search the following vehicle:

2005 Honda Odyssey, ND/JXY159, VIN: 5FNRL38625B055910



## ATTACHMENT B

## ITEMS SUBJECT TO SEARCH AND SEIZURE

The items that are the subject of the search and seizure applied for in this affidavit are as controlled substances and paraphernalia, firearms, receipt of income and expenses, cellular telephones, vehicle purchase records and documents documenting control and ownership by Dustin LARK which will be found in the location set forth in Attachment A, for the period beginning October 21, 2014 through the date of this search warrant, which constitute evidence, contraband and instrumentalities related to violations of federal offenses related to drug trafficking in violation of Title 21 U.S.C. §§ 841(a)(1) and 846, felon in possession of a firearm in violation of Title 18 U.S.C. § 922(g) and instrumentalities of money laundering violations of Title 18 U.S.C. § 1956.

1.      Controlled substances including cocaine in violation of 21 U.S.C. Sections 841(a)(1) and 846;

2.      Firearms and other dangerous weapons and ammunition;

3.      Paraphernalia for packaging, smuggling, processing, diluting, manufacturing, weighing and distributing controlled substances, for example: hidden compartments, scales, blenders, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutants such as inositol, vitamin B12, etc;

4.      Financial profits, proceeds and instrumentalities of trafficking narcotics and money laundering, including U.S Currency;

5.      Books, records, receipts, notes, ledgers, and other documents relating to financial transaction, communications between members of the conspiracy;

6.      Personal books and papers reflecting names, addresses, telephone numbers, articles of clothing, photos and other contacts including identification data relating to the distribution of controlled substances and money laundering;

7.      Financial records and personal objects relating to money laundering and expenditures of money and wealth, to-wit: money orders, wire transfer records, cashier's checks and receipts, checks, bank account records, passbooks, tax records, safe deposit box keys, and records, checkbooks, title files, vehicle purchases and check registers, as well as precious metals/jewelry such as gold, silver, diamonds, Rolex watches, earrings, necklaces, etc.;

8.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises, including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

9.      Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries; airline schedules; bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel-related businesses; airline, rent-a-car, and hotel frequent flier or user cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel;

10.     Cellular telephones other electronic communication devices which constitute evidence of participation in a conspiracy to distribute controlled substances, prostitution and money laundering;

11.     Computers and other electronic storage devices possessing the capability to access the internet, book transportation services online, access e-mail, send and receive text messages, store records of financial transactions and debts, access online bank records.

12.     Latent prints and identifying material from items at the premises.